**Carl Eugene KELLY,
Petitioner–Appellant,**

v.

**James A. LYNAUGH, Director, Texas
Department of Corrections,
Respondent–Appellee.**

No. 87–1520.

United States Court of Appeals,
Fifth Circuit.

Dec. 22, 1988.

John T. Barrett, Jr., Austin, Tex., for petitioner-appellant.

Jim Mattox, Atty. Gen., Charles A. Palmer, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before POLITZ, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

Sentenced to death by the State of Texas, Carl Eugene Kelly seeks federal relief in this, his first request for federal habeas. The United States District Court granted the State's motion for summary judgment and denied the writ. We affirm.

## I

### A

Carl Eugene Kelly was convicted of the capital murder of Steven Pryor, a conve-nience store clerk in Waco, Texas. The jury found Kelly guilty on June 4, 1981, and the next day answered affirmatively the special interrogatories submitted pursuant to article 37.071 of the Texas Code of Criminal Procedure.[1]

The Texas Court of Criminal Appeals affirmed Kelly's conviction and sentence on April 25, 1984. Rehearing was denied, and the United States Supreme Court denied certiorari. *Kelly v. State,* 669 S.W.2d 720 (Tex.Crim.App.) (en banc), *reh'g. denied,* (May 23, 1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 362, 83 L.Ed.2d 298 (1984).

Kelly was scheduled to be executed before sunrise on February 25, 1985. On February 6, 1985, he filed an application for writ of habeas corpus with the Texas courts. *See* Tex. Crim. Proc. Code Ann. art. 11.01–.64 (Vernon 1977 & Supp. 1988). The Texas Court of Criminal Appeals denied the writ application and a motion for stay of execution. *Ex parte Kelly,* Application No. 14,711, slip op. (Tex.Crim.App. Jan 11, 1985). Kelly has exhausted his state remedies.

Kelly sought a writ of habeas corpus and a stay of his execution from the federal courts. Four days later, on February 19, 1985, he obtained a stay from the United States District Court for the Western District of Texas. Nearly twenty-eight months later, the district court granted the State's motion for summary judgment and denied Kelly's petition for writ of habeas corpus. In the meantime, no new execution date has been set by the state.

### B

The facts before the jury were summarized by the Texas Court of Criminal Appeals as follows:

1. At the sentencing proceeding the court submits three questions to the jury:
   (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
   (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
   (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
   Tex.Crim.Proc. Code Ann. art. 37.071(b) (Vernon Supp. 1988). Since Kelly raised no claim of provocation, only the first two questions were submitted to the jury in this case.

The evidence reveals that on September 2, 1980, the victims, Steven Pryor and David Wade Riley, a transient found asleep in Pryor's 1980 brown Camaro automobile, were kidnapped from the convenience store where Pryor was employed at approximately 4:15 a.m. and taken to Cameron Park where they were both murdered. Diana Player, an acquaintance of Pryor's and a regular customer at the store, testified she saw "three black males" escort the victim to his car outside the store and watched the victim drive toward Cameron Park. Player was soon joined at the unattended convenience store by Ed Torres, an off-duty policeman, who telephoned police to report the missing attendant. Shortly thereafter and before police arrived, Dewey Verona, a regular customer of Pryor's, arrived at the site and, at trial, testified he saw a man get out of the victim's car which had pulled up across the street from the store, dropped the man off and then departed. Verona testified he followed the man's path with his eyes and only "lost contact with him for a few minutes" until the same man approached the group and asked for assistance in starting his stalled automobile parked near the store. The three witnesses and two police officers called to the scene testified that the man who requested assistance (later identified as the appellant) appeared to have blood on his shirt, his arm and his two-toned shoes. When police officers questioned the appellant about the blood, he replied that he had gotten into a fight earlier that evening. Upon asking for identification, appellant replied that he had none. Police officers characterized appellant as "belligerent" and testified appellant was found in the store, which had been sealed off to the public, twice after previously being asked to leave. While in the store, appellant asked the investigator dusting for fingerprints whether he had found any and quickly told the officer that he had been in the store earlier "buying a slurpee" and wished to purchase another. After working on his stalled vehicle, appellant subsequently left the convenience store area.

An All–Points–Bulletin was issued for the victim's 1980 Camaro which was later stopped at approximately 6 a.m. by police officers outside Hillsboro. The driver, Thomas Graves, was arrested and a search of the car followed. Items retrieved in the trunk of the car included the appellant's billfold; two revolvers; a green canvas sack which contained money; a backpack which contained clothes and prescription bottles in the name of David Wade Riley; and blood-stained towels. Blood stains were found on the door and floormat of the automobile. Limestone dust found on the floorboard of the car was the clue that led police officers to Cameron Park where the bodies were found at the bottom of a cliff in the park area. Upon discovering the appellant's billfold in the trunk of the victim's car, an arrest warrant was issued. At approximately 10:00 a.m. appellant was arrested at his place of employment.

*Kelly v. State,* 669 S.W.2d at 721–22.

## II

### A

Kelly first argues that his right against self-incrimination was denied when his right to terminate questioning was not scrupulously honored. Kelly relies on *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), in which the Supreme Court concluded "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. at 326.[2]

---

**2.** The court focused on a single *Miranda* passage:

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the

Waco police first questioned Kelly at the station house on September 2, 1980, shortly after taking him before a justice of the peace who at 10:57 a.m. gave him *Miranda* warnings. Kelly answered "no" when asked if he wanted to talk. Questioning stopped and Kelly was taken to the city jail.

Officer Bobby Luedke removed Kelley from the jail at 4:00 p.m. that same afternoon.[3] The police told Kelly of the charges against him and gave *Miranda* warnings. When Kelly refused to answer questions, the questioning stopped, and he was returned to jail.

Officer Luedke next removed Kelly from jail that same evening somewhere between 8:30 and 10:00 p.m. to conduct a gun powder residue test. Luedke told Kelly that Kelly's co-defendant, Thomas Graves, had given a statement implicating Kelly. Kelly indicated a willingness to talk if he was shown Graves' signature at the bottom of a statement. After seeing the signature, and without new *Miranda* warnings, Kelly orally confessed. When the confession was reduced to writing,[4] the *Miranda* warnings were stated at the top of the first page. Immediately below the *Miranda* warnings was the phrase "I understand my rights as set out in this warning and knowing what they are I freely and voluntarily, without being forced or compelled by promises, threats, or persuasion, waive these rights...."

*Miranda* should not be "read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Mosley,* 423 U.S. at 102–03, 96 S.Ct. at 326. The circumstances of each case determine whether the right to cut off

questioning was scrupulously honored. In *Mosley,* the police stopped the interrogation upon the defendant's request. Questioning resumed after more than two hours had passed, with a new set of *Miranda* warnings, and only about a crime that had not been the subject of the first interrogation. *Id.* at 105–06, 96 S.Ct. at 327. The Supreme Court concluded that the right to terminate questioning had been scrupulously honored.

We found that the right to end questioning had not been scrupulously honored in *United States v. Hernandez,* 574 F.2d 1362 (5th Cir.1978). After arrest, Hernandez was given *Miranda* warnings and declined to make a statement. Questioning stopped. Police then kept Hernandez in a police wagon for approximately five hours, even though the station was only minutes away. Upon arrival at the station at 5:00 a.m., Hernandez was again informed of his rights and again declined to talk. The police nevertheless interrogated him "at least two, and perhaps three times more" and Hernandez gave a statement within 45 minutes after arriving at the station. *Id.* at 1365. "It [was] patently obvious that the police ignored [his] repeated invocation of his right to remain silent." *Id.* at 1369.

■ We find here that the police scrupulously honored Kelly's decision to terminate questioning, despite Kelly's attempts to characterize his situation as being more like *Hernandez* than like *Mosley.* First, interrogations ceased immediately each time Kelly expressed a desire to remain silent. Second, the police did not repeatedly interrogate Kelly as occurred in *Hernandez;* rather, the efforts to question Kelly were spread over seven to twelve hours. *See United States v. Corral–Martinez,* 592 F.2d 263, 267 (5th Cir.1979) (sec-

---

right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Mosley,* 423 U.S. at 100–01, 96 S.Ct. at 325 (quoting *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966)); *see also Arizona v. Roberson,* — U.S. ——, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

**3.** Officer Luedke testified at the hearings on Kelly's motion to suppress that the second and third interrogations were at 1:30 p.m. and 5:00 p.m. He testified at trial that the interrogations were at 4:00 p.m. and between 8:30 and 10:00 p.m.

**4.** Texas law requires confessions to be in writing. Oral confessions are inadmissible unless electronically recorded. *See* Tex.Crim.Proc. Code Ann. art. 38.22 § 3 (Vernon Supp.1988).

ond interrogation given four and a half hours after first). Third, oral warnings were administered twice and written warnings once.[5] Even had no written warning been given, it would be difficult to conclude that Kelly had forgotten his *Miranda* rights. *See Evans v. McCotter,* 790 F.2d 1232, 1238 (5th Cir.), *cert. denied,* 479 U.S. 922, 107 S.Ct. 327, 93 L.Ed.2d 300 (1986); *see also Stumes v. Solem,* 752 F.2d 317, 321 (8th Cir.) (finding that failure to give *Miranda* warnings before second interview did not establish *Mosley* violation), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985). Finally, it is not decisive that the interrogations covered the same crime. *See Jackson v. Wyrick,* 730 F.2d 1177, 1180 (8th Cir.) ("Although each of the interrogations concerned the murder of the prison guard, this factor alone is not sufficient to find a violation of … *Miranda* rights under *Mosley*."), *cert. denied,* 469 U.S. 849, 105 S.Ct. 167, 83 L.Ed.2d 102 (1984). In short, nothing in the record indicates that the police "persist[ed] in repeated efforts to wear down [Kelly's] resistance and made him change his mind." *Mosley,* 423 U.S. at 105–06, 96 S.Ct. at 327. Instead, the record indicates only that Kelly's right to cut off questioning was scrupulously honored.

## B

■ We also reject Kelly's related contention that he did not voluntarily waive his right to remain silent.[6] The state trial court found that Kelly "voluntarily waived the rights of which he was advised."[7] This finding is supported by the record and entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

## III

■ Kelly next argues that his trial counsel was ineffective in two respects. First, counsel failed to object to the trial court's failure to instruct the jury to disregard "the illegally obtained evidence," presumably his confession.[8] The trial court, however, instructed the jury regarding voluntariness in compliance with the Texas Criminal Code.[9] The court instructed the jury that to consider the confession it had to find both that the confession was given voluntarily and that Kelly had waived his rights voluntarily.

---

5. Moreover, we have been "unwilling to hold as a matter of law that a printed card, read by a person shown to have understood the warnings, cannot satisfy *Miranda.*" *United States v. Bailey,* 468 F.2d 652, 660 (5th Cir.1972).

6. Whether a waiver is valid involves an inquiry of two dimensions:

First[,] the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

7. In his order overruling the motion to suppress the confession, the state trial court made these findings of fact:

(1) The confession was made by the Defendant, freely and voluntarily, after having been advised of, and having understood, the Miranda warnings, and having freely and voluntarily waived all the rights of which he was advised.

(2) The Defendant was not coerced, threatened, or forced, physically, emotionally or in any other manner, to make the confession.

(3) The Defendant was not under the influence of any drug or alcohol at the time the confession was made.

(4) The confession was not made subsequent to or as a result of an illegal arrest.

8. Kelly, however, may be referring to the two-toned shoes he wore at the murder. Kelly contested their admissibility on appeal to the Texas Court of Criminal Appeals. The trial court overruled the motion to suppress this evidence, and the Texas Court of Criminal Appeals affirmed on this issue. *See Kelly,* 669 S.W.2d at 725–26. Kelly thus has failed to demonstrate any prejudice. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

9. "When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to [the admissibility of] such statement." Tex.Crim.Proc. Code Ann. art. 38.22 § 7 (Vernon 1979).

■ Second, counsel allegedly was ineffective in failing to request a charge on mitigation of punishment due to voluntary intoxication. Of course, to succeed Kelly must demonstrate prejudice from his counsel's failure to object. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). He fails to show such prejudice. In a supplemental brief, Kelly's counsel "acknowledges that there exists little evidence in this case which could be classified as mitigating," and points out that this type of mitigating evidence can be a "double-edged sword ... [that] creates a sense of fear in the jury as often as it creates a sense of sympathy." We agree. This is a classic example of a judgment call by trial counsel and we are pointed to nothing to suggest that it was otherwise. *See Strickland,* 104 S.Ct at 2065; *see also Millard v. Lynaugh,* 810 F.2d 1403, 1410 (5th Cir.) (citing *Strickland*), *cert. denied,* — U.S. —, 108 S.Ct. 122, 98 L.Ed.2d 81 (1987).

■ Nor was the district court required to hold an evidentiary hearing to determine whether trial counsel's failure to request a charge on mitigation was due to ineffectiveness.

> The law in this circuit is clear: to be entitled to a hearing on ineffectiveness, a habeas petitioner must allege facts which, if proved, would overcome the presumptions that trial counsel is effective and that trial conduct is the product of reasoned strategy decisions.

*Taylor v. Maggio,* 727 F.2d 341, 349 (5th Cir.1984). Kelly has not alleged such facts, and we decline to require an evidentiary hearing on his claim of ineffective assistance of counsel. *See Baldwin v. Blackburn,* 653 F.2d 942, 947 (5th Cir. Unit A 1981).

■ Kelly also alleges his appellate counsel was ineffective because he failed to raise the admissibility of the confession on appeal. Again, however, Kelly fails to meet the *Strickland* standard. Kelly suffered no prejudice because the *en banc* Texas Court of Criminal Appeals specifically reviewed the confession issue. *Ex parte Kelly,* Application No. 14,711, slip op. (Tex. Crim.App. Jan. 11, 1985).

## IV

Kelly also attacks the constitutionality of Texas' capital punishment scheme, urging that it is flawed because the jury is prevented from considering mitigating evidence except on the issues of the deliberateness of the murder and the probability of future dangerousness.[10] Until recently, the constitutionality of the Texas capital punishment scheme was a settled matter. *See Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *see also Lockett v. Ohio,* 438 U.S. 586, 607, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973 (1978) (Burger, C.J.). However, in *Franklin v. Lynaugh,* — U.S. —, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), prior law was called into question when only four justices joined the plurality opinion reaffirming *Jurek.* Justice O'Connor's concurrence affirmed the constitutionality of the Texas scheme as related to the mitigating evidence before the Court in *Franklin,* but the opinion rested on grounds suggesting that different mitigating circumstances might warrant a different result.[11]

Since Justice O'Connor's concurrence presents the narrower of the two positions attracting the majority required for affirmance, we take it as the rule of *Franklin,* at least until the Court speaks more clearly. The test used by the concurrence is described in the following passage:

> If ... petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance

---

10. Kelly also argues that a reliable prediction of future dangerousness is impossible. The Supreme Court disagrees. *See Jurek v. Texas,* 428 U.S. 262, 274–76, 96 S.Ct. 2950, 2957–58, 49 L.Ed.2d 929 (1976). This portion of *Jurek* was not called into question by *Franklin v. Lynaugh,*

— U.S. —, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

11. The Supreme Court will again consider the *Franklin* issue in *Penry v. Lynaugh,* 832 F.2d 915 (5th Cir.1987), *cert. granted,* — U.S. —, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988).

to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence. If this were such a case, then we would have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation.

*Franklin,* 108 S.Ct. at 2333 (O'Connor, J., concurring). The opinion concludes, however, that the mitigating evidence introduced by Franklin, his discipline record while in custody, could be given mitigating effect by the jury in answering the question regarding future dangerousness. *Id.*

■ Kelly only points specifically to one item of potentially mitigating evidence in his case.[12] In the guilt phase of the trial, Kelly's confession was introduced which indicated that he had taken drugs sometime prior to the murders. Kelly's counsel did not emphasize this fact in the sentencing phase. Even if this evidence of voluntary intoxication is considered mitigating, it could clearly be given full effect by the jury in deciding whether Kelly acted deliberately. We have already held that Kelly's counsel was not ineffective for failing to request a charge on mitigation due to voluntary intoxication.[13]

Kelly argues that more mitigating evidence was not offered because at the time of trial no instructions regarding the mitigating effect of the evidence could have been obtained. Since much mitigating evidence can be a "double-edged sword," creating fear in the jury as well as sympathy, Kelly contends that his trial counsel made a rational choice to withhold such evidence without specific instructions to the jury regarding its mitigating impact. As examples of such "double-edged" evidence, Kelly points to a defendant's poor childhood characterized by abuse or neglect, his history of drug use, or his diminished mental capacity. Kelly has not previously made this argument. The state makes no contention that Kelly has failed to exhaust his state remedies and we do not rest on this point. However, we nonetheless decline to consider the argument here because it was not made to the federal district court.

## V

### A

Kelly also attacks the constitution of the jury. He argues that Aron Foster was excluded for cause contrary to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A state can exclude for cause

> those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their atti-

12. During the sentencing phase of the trial, Kelly's counsel attacked the death penalty on moral and pragmatic grounds, as well as putting his step-father on the stand to ask the jury to spare Kelly's life. Though these matters may well impact a jury's decision, they are not mitigating evidence within the meaning of Justice O'Connor's opinion in *Franklin,* since they do not reflect on Kelly's personal culpability. Kelly's attorneys also tried to capitalize on any residual doubt regarding the jury's guilty verdict. All nine justices rejected an attack on the Texas scheme based on the jury's alleged inability to consider residual doubts in answering the two special verdict questions. *Franklin,* 108 S.Ct. at 2326–28 (plurality), 2334–35 (concurrence), 2335 (dissent; stating that it did not disagree with plurality discussion). Kelly's step-father also testified that Kelly dropped out of school after tenth or eleventh grade because "he just didn't have the knowledge to go through school

like the average kid." He further testified that Kelly was twenty-one or twenty-two years old at the time of trial. Counsel did not argue in closing that Kelly's age, mental capacity, or educational background warranted a lighter sentence. Kelly's present counsel apparently does not view these facts as mitigating evidence. We agree. These isolated facts, without further development, fail to show that Kelly bore less responsibility for his actions than other citizens. The State's evidence in the sentencing phase consisted of several witnesses' testimony regarding Kelly's bad reputation for being a peaceable and law-abiding citizen, as well as evidence of a prior conviction for theft, revocation of Kelly's probation, and a three-year prison term for robbery.

13. We note that the state does not rely on any procedural default, such as failure to observe the state's contemporaneous objection rule.

tude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* at 522–23 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original). We now look to whether the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)); *see also Woolls v. McCotter,* 798 F.2d 695, 699 (5th Cir.1986) (following *Wainwright).* The trial court's decision to exclude the juror is presumed correct under 28 U.S.C. § 2254(d). *See Wainwright v. Witt,* 469 U.S. at 426–29, 105 S.Ct. at 853–55; *see also Woolls,* 798 F.2d at 699 (applying § 2254(d) standard).[14]

■ Kelly must adduce "clear and convincing evidence" that the state court's factual determination was erroneous. *See Wainwright,* 469 U.S. at 435, 105 S.Ct. at 858. He has failed to do so. We are persuaded that Mr. Foster properly was excused; the record makes it plain. *See Wicker v. McCotter,* 783 F.2d 487, 493 (5th Cir.), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).[15]

14. A trial court is not required to spell out his specific reasons for excusing each venireman. Even if the record is silent as to the standard employed by a state trial judge, ... he is presumed to have applied the correct standard.
*Wicker v. McCotter,* 783 F.2d 487, 493 (5th Cir.), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

15. A. [Foster] If I can't understand nothing, I'm not going to answer that, and I don't understand that. You said either one. Of course, I don't know which one would give him the electric chair, or what. See, I don't know which one would do.
Q. [State] Either one. Either one. If you answered either—
A. Well, then, I would say "No". I'm stilling saying that now. I would say "No", because if I don't know which one would give life imprisonment, I might would say, yeah. But I ain't never going to say yeah on the one that will kill him. I'm not ever going to say that....
Q. All right. Let me give you an example. Okay. These two questions.
A. Yeah. But I asked you which one of them questions?
Q. Okay. Say the second one means, if you answer—say the jury agrees, and everybody says "Yes" on the first one. Well, that means the second one is the one that is going to give him the death penalty.
A. No. That couldn't. That might not mean that.
Q. Sir?
A. It might not mean that.
Q. That's what the law says. If the first one is answered "Yes", then it goes to the second one. If the second one is answered "Yes", he gets the death penalty. If the second one is answered "No", it is life in prison.
A. Well, which one of them—them questions?
Q. Well, both of them. It depends.
A. Now, both questions ain't got the same answer.
Q. Well, if they do have the same answer, both of them have the "Yes" answer, death penalty.
A. I would say "No".
Q. You would have to say "No" to one of them?
A. To both of them, if they both meant the same thing.
Q. Okay. In other words, you would have to say "No", regardless of what the Judge told you to do?
A. Yeah. I would say "No", because I don't believe in killing nobody. I don't believe in that.
Q. Okay. You would have to say "No", regardless of what the evidence shows?
A. Yeah. If it meant for him to be killed, I would say "No"....
Q. [Defense] Aaron, right now, you really don't know what you would do, because you haven't heard any evidence, right? But you could consider the flip side of the coin?
A. I'm not going to change what I said.
Q. You could consider the flip side of the coin, and just based on the evidence answer the questions, right?
A. No. I don't go for capital punishment, now. I done told you that....
Q. [Court] Mr. Foster—
A. Uh-huh.
Q. —let's assume you are a juror. Not in this case, but just in a capital murder case. And you and the jury had gone out and found that the man did commit the crime, you found him guilty. Okay?
A. Yeah. I understand that.
Q. All right. Then you come back in and you sit in the jury box and you hear more evidence on his criminal history and what kind of person he is, what kind of character he has got, and that kind of thing. Okay?
A. I understand.
Q. Okay. All right. Then, I give you a piece of paper, it goes out, and it has got two questions, and the first question asks you if he acted deliberately, more or less? Say

**B**

Kelly next argues that the jury was unconstitutionally conviction-prone and did not reflect the "contemporary standards of decency" required by the Constitution. The Supreme Court has rejected this argument, finding that the removal for cause of "*Witherspoon*-excludables" did not violate a constitutional right to an impartial jury. *See Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 1770, 90 L.Ed.2d 137 (1986); *see also Brogdon v. Blackburn*, 790 F.2d 1164, 1169 (5th Cir.1986) (deciding that *Lockhart* foreclosed such a claim), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987). Nor do death-qualified juries violate the fair cross-section requirement. *See Lockhart*, 106 S.Ct. at 1766; *see also Wicker v. McCotter*, 783 F.2d at 493–94 (rejecting unfair bias and fair cross-representation arguments). Finally, Kelly provides no case law to support his "contemporary standards of decency" contention.

**VI**

Kelly finally launches a general attack on the death penalty. He argues the Texas death penalty scheme has been applied in an arbitrary and capricious manner since 1973 and that it was applied in Kelly's case in an arbitrary and invidious manner. This is not argument but rhetoric, for Kelly provides no facts or studies to support his allegation. We reject it.

Kelly argues that Texas applies the death penalty in a racially discriminatory fashion, but does not establish "that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 1766, 95 L.Ed.2d 262 (1987).

Kelly next asserts that the death penalty has no penological justification. However, "it is settled that the death penalty may, as a general rule, be imposed on individuals for capital murder who themselves killed, attempted to kill, or intended that a killing take place." *See Evans v. McCotter*, 790 F.2d 1232, 1243 (5th Cir.), *cert. denied*, 479 U.S. 922, 107 S.Ct. 327, 93 L.Ed.2d 300 (1986); *see also Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987) (stating that death penalty may be used on defendant whose mental state was one of reckless indifference to human life).

Finally, Kelly argues against lethal injection as a method of execution, arguing that it is cruel and unusual punishment, especially when administered by an unqualified person. Again, we already have rejected this argument. *See Woolls*, 798 F.2d at 698.

AFFIRMED.

JOHNSON, J., concurs in the judgment.

---

you don't have any problem with that, you all agree he acted deliberately, and you answer that "Yes". And then answer the second question.... Now, if you answered that question "Yes", it is going to be my job to say the death penalty is the punishment. If you answer that question "No", it is my job to say it is life imprisonment. Now, are you telling me that you're going to answer that question "No", no matter what kind of evidence you heard, and no matter what

you really think is right, so he won't get the death penalty?
A. I don't want him dead. I say, no, don't kill him.
Q. No matter what the evidence is?
A. No matter what the evidence is, you can put him away without killing him.

The Texas Court of Criminal Appeals also examined the record and set forth the relevant portions of the voir dire examination. *See Kelly*, 669 S.W.2d at 726–27 n. 9.