# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70036

United States Court of Appeals
Fifth Circuit

**FILED**

November 13, 2014

Lyle W. Cayce
Clerk

RUBEN GUTIERREZ,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No.1:09-CV-22

Before DAVIS, SOUTHWICK, and HIGGINSON, Circuit Judges.

PER CURIAM:*

Petitioner-Appellant Ruben Gutierrez ("Gutierrez") was convicted of capital murder in Texas and sentenced to death. He now seeks a certificate of appealability ("COA") from the district court's denial of habeas corpus relief. Because Gutierrez has failed to make a substantial showing of a denial of a constitutional right, we deny his application for a COA.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-70036

I.

The State of Texas charged Gutierrez with capital murder committed in the course of a robbery. In its order affirming Gutierrez's conviction, the Texas Court of Criminal Appeals set forth the facts of the case as follows:

> The evidence shows that the 85-year-old victim kept approximately $600,000 in cash in her home which also served as an office for a mobile home park she owned and managed. The victim had befriended appellant and appellant knew the victim kept a lot of cash in her home office.
>
> Appellant developed a plan to steal the victim's money. On September 5, 1998, the 21-year-old appellant and an accomplice, whom the victim did not know, went into the victim's home/office to carry out this plan. When appellant and the accomplice left with the victim's money, the victim was dead. She had been severely beaten and stabbed numerous times.
>
> Appellant claimed in his third statement to the police that "we" (he and the accomplice) had two different types of screwdrivers when they entered the victim's home/office to steal her money. Appellant also claimed that the initial plan was for the accomplice to lure the victim out of her home/office through the front by some innocent means at which time appellant would go in through the back and take the victim's money without the victim seeing him. This plan was frustrated when the victim saw appellant enter through the front door while the accomplice was still inside with her. Appellant claimed that soon after this, the accomplice began to beat, kick, and stab the victim with a screwdriver while appellant got her money. Appellant did nothing to prevent the accomplice from attacking the victim.
>
> The medical examiner testified that the victim suffered various defensive wounds indicating that she struggled for her life and tried to "ward off blows or attacks of some sort." The medical examiner also testified that the victim suffered approximately thirteen stab wounds, caused by two different instruments – one "almost certainly" a flat head screwdriver and the other possibly a

No. 13-70036

Phillips head screwdriver. The victim died from "massive blows to the left side of the face."

The state trial court instructed the jury "it could convict appellant of capital murder if, among other things, it found that appellant 'acting alone or as a party' with the accomplice intentionally caused the victim's death." The jury found Gutierrez guilty.

During the punishment phase of the trial, the trial court instructed the jury that, to determine whether the court would sentence Gutierrez to death, it should consider (1) whether Gutierrez was a future societal danger; (2) whether Gutierrez caused the killing or anticipated that a human life would be taken; and (3) whether sufficient circumstances mitigated against imposing a death sentence. Because the jury answered the first two questions in the affirmative and the third question in the negative, the trial court sentenced Gutierrez to death.

Gutierrez filed a motion for a new trial, which the state trial court denied after holding a hearing. The Texas Court of Criminal Appeals affirmed Gutierrez's conviction and sentence on direct appeal.

Gutierrez then applied for a writ of habeas corpus in the state court. The state trial court transmitted findings of fact and conclusions of law to the Texas Court of Criminal Appeals. The Texas Court of Criminal Appeals denied the bulk of Gutierrez's claims, but remanded the case to the trial court so it could supplement the habeas corpus record with respect to two of Gutierrez's ineffective assistance of counsel claims. After the trial court followed these instructions, the Texas Court of Criminal Appeals rejected Gutierrez's two remaining claims.

Gutierrez then filed a federal petition for a writ of habeas corpus in the district court. Because his petition included two claims that he had not raised in his initial state habeas petition, the district court stayed and

No. 13-70036

administratively closed the case to allow him to fully exhaust his state court remedies. Gutierrez then raised the two unexhausted challenges in the state court. Because Gutierrez failed to raise those claims in his previous petition, the Texas Court of Criminal Appeals dismissed the successive application as an abuse of the writ without considering its merits.

Gutierrez also filed a motion for post-conviction DNA testing in the state court. The state trial court denied that motion, and the Texas Court of Criminal Appeals affirmed.

The district court reopened Gutierrez's federal habeas case once the state court proceedings concluded. The district court then denied Gutierrez's habeas petition in its entirety. The court also denied a COA on all of Gutierrez's claims without holding an evidentiary hearing.

II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must obtain a COA before appealing the district court's denial of habeas relief.[1] To obtain a COA, the prisoner must "ma[k]e a substantial showing of the denial of a constitutional right."[2] "A petitioner satisfies this standard if 'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"[3]

"We evaluate the debatability of [Gutierrez]'s constitutional claims under AEDPA's highly deferential standard, which 'demands that state-court decisions be given the benefit of the doubt.'"[4]

---

[1] *Newton v. Dretke*, 371 F.3d 250, 254 (5th Cir. 2004) (citing 28 U.S.C. § 2253(c)(2)).

[2] 28 U.S.C. § 2253(c)(2).

[3] *Trottie v. Stephens*, 720 F.3d 231, 239 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1540 (2014) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

[4] *Id*. at 240 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

No. 13-70036

[A] habeas petitioner must prove that the constitutional adjudication by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5]

"We defer to the state trial court's factual findings and consider only the record that was before the state court."[6]

## III.

Gutierrez argues that we should issue a COA because reasonable jurists would disagree with the district court's rulings that:

(1)    the interrogating officers did not violate Gutierrez's constitutional rights when obtaining inculpatory statements from him;

(2)    the evidence was legally sufficient to support his conviction and death sentence;

(3)    the jury was capable of delivering a fair and impartial verdict;

(4)    Gutierrez's claims of juror misconduct were both procedurally defaulted and meritless;

(5)    the prosecutor did not improperly question a defense witness regarding his religious beliefs in order to discredit him; and

(6)    the Government timely disclosed the existence of potentially exculpatory DNA evidence.

---

[5] *Id.* (internal citations omitted).

[6] *Id.* at 241 (internal citations omitted).

No. 13-70036

For the following reasons, none of Gutierrez's arguments have merit, so we deny Gutierrez's request for a COA on all claims.

## A.

Gutierrez first argues that the trial court erroneously admitted his inculpatory statements to the police into evidence. He claims that "the State violated his constitutional rights when police elicited statements from him after he invoked his right to remain silent." He further argues that the police coerced him into making a statement by "threaten[ing] to arrest his wife and to have the Department of Children and Family [S]ervices take their children if he did not cooperate and give a statement." Gutierrez also claims that his counsel rendered ineffective assistance by failing to raise these challenges in the state court proceedings.

> Where the question presented in a section 2254 proceeding is whether a confession admitted at trial was voluntary and in compliance with *Miranda*, with respect to issues of underlying or historic facts, the state court findings, if fairly supported in the record, are conclusive, but there is independent federal determination of the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution.[7]

## 1.

We first consider whether the interrogating officers violated Gutierrez's right to remain silent by reinterrogating him on two subsequent occasions several days after he terminated his initial interview. "[T]he admissibility of statements obtained after the person in custody has decided to remain silent

---

[7] *West v. Johnson*, 92 F.3d 1385, 1402 (5th Cir. 1996) (citing *Miller v. Fenton*, 474 U.S. 104, 110-14 (1985)).

depends . . . on whether his 'right to cut off questioning' was 'scrupulously honored.'[8] This depends on

> (1) whether the suspect was advised prior to initial interrogation that he was under no obligation to answer question [sic]; (2) whether the suspect was advised of his right to remain silent prior to the reinterrogation; (3) the length of time between the two interrogations; (4) whether the second interrogation was restricted to a crime that had not been the subject of earlier interrogation; and (5) whether the suspect's first invocation of rights was honored.[9]

No single factor is dispositive.[10]

Under this standard, reasonable jurists would not debate whether the police officers scrupulously honored Gutierrez's right to remain silent. First, the trial court found that, before conducting the initial interrogation on September 9, 1998, the officers informed Gutierrez of his right to remain silent or to terminate the interview. The evidence presented at the pretrial suppression hearing supports that finding. Indeed, Gutierrez exercised his right to terminate the initial interview shortly after it began.

Second, the state court found that the officers again advised Gutierrez of his rights before reinterrogating him several days later, and the record supports that finding as well. The officers testified at the suppression hearing that they advised Gutierrez of his rights before each interrogation. Moreover, at each subsequent interview, Gutierrez signed and initialed on a written *Miranda* form that he understood that he had the right to remain silent and terminate the interview, and that he agreed to waive those rights.

---

[8] *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

[9] *United States v. Alvarado-Saldivar*, 62 F.3d 697, 699 (5th Cir. 1995) (citing *Mosley*, 423 U.S. at 104-05).

[10] *Hebert v. Cain*, 121 F. App'x 43, 46 (5th Cir. 2005) (citing *Kelly v. Lynaugh*, 862 F.2d 1126, 1131 (5th Cir. 1988)).

No. 13-70036

Third, the state court found that four days passed between the time Gutierrez terminated the initial interview and the time the police officers arrested and reinterrogated him. Because a break of two or more hours between successive interrogations is generally sufficient,[11] this factor favors the Government.

It is undisputed that the successive interrogations implicated the same crime as the initial interrogation. Although this factor favors Gutierrez, "it is not decisive."[12] The Government's strong showing on the other four factors outweighs the fact that all of the interrogations concerned the same offense.

Finally, the officers honored Gutierrez's first invocation of his right to remain silent. The state court credited the officers' testimony at the suppression hearing that they terminated the initial interview upon Gutierrez's request.

Gutierrez argues in a Rule 28(j) letter that, once he exercised his right to remain silent after receiving *Miranda* warnings, the police were forbidden from questioning him further unless he initiated further communication with the police. That prohibition applies only to the right to *counsel*, which this appeal does not implicate; it does not apply to the right to remain silent.[13] The fact that the police initiated subsequent communications with Gutierrez therefore does not affect the admissibility of Gutierrez's inculpatory statements.

In sum, we defer to the state court's findings that the officers scrupulously honored Gutierrez's right to remain silent, which are amply

---

[11] *See Mosley*, 423 U.S. at 104, 107.

[12] *Kelly*, 862 F.2d at 1131.

[13] *Charles v. Smith*, 894 F.2d 718, 725-26 (5th Cir. 1990) (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981); *Mosley*, 423 U.S. at 97-98, 102-04).

No. 13-70036

supported by the record. Because reasonable jurists would not debate this issue, we deny a COA on this claim.

2.

Gutierrez claims the officers coerced him into making inculpatory statements by threatening to take away his wife and children. The state court, relying on the officers' testimony at the suppression hearing that they did not threaten Gutierrez, determined that the officers did not make these threats. We defer to the state court's finding, which is fairly supported by the record.[14] We therefore deny a COA on Gutierrez's coercion claim as well.

3.

Because Gutierrez has failed to show that reasonable jurists would debate whether the state trial court erroneously admitted his statements to the police into evidence, Gutierrez has failed to show that his attorney's failure to raise such an objection amounted to ineffective assistance.[15] We therefore deny a COA as to Gutierrez's ineffective assistance claim.

B.

Gutierrez also claims that the evidence introduced at trial "was legally insufficient to support a conviction for capital murder or the death sentence because the State failed to prove that he had specific intent to commit murder or that he personally caused the death of the victim (either alone or with [his accomplice])."

---

[14] *See West*, 92 F.3d at 1402 (citing *Miller*, 474 U.S. at 110-14).
[15] *See Strickland v. Washington*, 466 U.S. 668, 691-92 (1984).

No. 13-70036

To succeed on this claim, Gutierrez must demonstrate that reasonable jurists would dispute whether, "upon the record evidence adduced at trial[,] no rational trier of fact could have found proof of guilt beyond a reasonable doubt."[16] We "view[] the evidence in the light most favorable to the prosecution."[17]

The Texas Court of Criminal Appeals ruled on direct appeal that

From the evidence that appellant and the accomplice went inside the victim's home office with two different types of screwdrivers, the evidence that the victim's stab wounds were caused by two different instruments, the evidence that the victim knew and could identify appellant, and the evidence that appellant did nothing to prevent the victim's murder, the jury could fairly infer that appellant "at the very least" was guilty as a party to intentionally murdering the victim.

The Texas Court of Criminal Appeals further reasoned that

A jury could fairly infer from this evidence and appellant's admission in his third statement to the police about "we" having two screwdrivers that appellant stabbed the victim with a screwdriver. A jury could also fairly infer from this evidence and the other circumstances of the offense that appellant and the accomplice also beat the victim to death. On this record, we cannot say the jury's verdict is irrational.

Based on our review of the record, and giving the state court's findings the deference to which they are entitled, we agree that the evidence produced at trial was sufficient to support the jury's finding of guilt. Gutierrez's statements to the police, which the state court properly admitted into evidence, establish both Gutierrez's presence at the scene of the crime and his involvement in the robbery. Based on this evidence and the additional evidence summarized in the Texas Court of Criminal Appeals' opinion, we are

---

[16] *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).
[17] *Id.* at 319.

satisfied that the jury could infer that Gutierrez participated in the murder, either as a principal or under Texas's law of parties. We therefore deny a COA on this issue.

## C.

Gutierrez argues next that the district court erred by rejecting his claim that the state trial court erroneously denied his for-cause challenge to venireperson Sergio Sanchez ("Sanchez"). According to Gutierrez, Sanchez's responses during voir dire demonstrated that he would automatically render a death sentence regardless of the evidence presented. After the trial court denied Gutierrez's motion to strike Sanchez for cause, Gutierrez exercised a peremptory strike against Sanchez. As a result, Gutierrez claims he was forced to exhaust his allotted peremptory strikes to challenge Sanchez, which in turn required him to accept an equally objectionable juror, Melquiades Perez ("Perez"). Gutierrez argues that the trial court also erroneously refused to strike Perez for cause. He contends that Perez should not have served on the jury because (1) he stated that he would always vote for a death sentence no matter what evidence Gutierrez presented and (2) he had difficulty distinguishing between the statutory elements of burglary and robbery.

Where the trial court erroneously refuses to dismiss a potential juror for cause and "the defendant elects to cure [this] error by exercising a peremptory challenge," the trial court's error does not violate the defendant's constitutional rights if the defendant is ultimately "convicted by a jury on which no biased juror sat."[18] Because Perez, rather than Sanchez, ultimately sat on the jury,

---

[18] *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000).

we must evaluate whether reasonable jurists would debate whether the state court should have excused Perez for cause.[19]

"[A] prospective juror may be excluded for cause because of his or her views on capital punishment" when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[20] Even where a juror "h[o]ld[s] a strong *personal* preference for the death penalty as a punishment for those convicted of capital murder," the trial court need not excuse that juror if he or she is capable of impartially applying the law instead of his or her own personal preferences.[21]

No reasonable jurist would debate whether the state court should have excluded Perez for cause under this standard. The record does not support Gutierrez's claim that Perez would "always vote for the death penalty" regardless of the evidence presented at trial. Perez's juror questionnaire stated *not* that he would automatically vote for the death penalty, but rather that "[he] would always vote for the death penalty in a case *where the law allows [him] to.*" During voir dire, Perez affirmed that his feelings regarding the death penalty would not cause him to falsely answer the special-issue questions during the punishment phase in order to obtain a death sentence.[22] Thus, no reasonable jurist would debate whether Perez was ultimately able to follow the court's instructions during the punishment phase of the trial.

We likewise reject Gutierrez's argument that Perez was unable or unwilling to properly apply the elements of the offense during the guilt phase

---

[19] *Id*. at 316.

[20] *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

[21] *See Miniel v. Cockrell*, 339 F.3d 331, 340 (5th Cir. 2003) (emphasis in original).

[22] *See* Tr. Vol. 16, at 30, 103-04 ("And what I'm asking is, is would you answer this falsely to ensure a certain result? / A. No, sir.").

of Gutierrez's trial. According to Gutierrez, Perez did not understand or appreciate that, in order to find Gutierrez guilty, he would have to believe beyond a reasonable doubt that Gutierrez committed murder in the course of a robbery ("where you use force or threat of force to take something from a person") as opposed to a mere burglary ("where you go into a house and take something from the house").

Perez initially expressed difficulty understanding the difference between "robbery" and "burglary." Perez at first claimed that he "wouldn't be able to separate the difference" between the two crimes, stating, "It's a different word, but to me it's the same meaning. You know, you still took something. It wasn't yours." Perez then suggested that, even if the indictment required proof of a robbery, he would still convict upon a showing of a mere burglary because "Robbery and burglary is the same thing to me." Perez then informed defense counsel that he would in all likelihood be unable to set aside his feelings in this regard.

However, as the prosecutor and the trial judge questioned Perez further, Perez displayed the ability and willingness to convict Gutierrez only if the prosecution established the robbery element beyond a reasonable doubt. Perez first affirmed to both the prosecutor and the trial judge that he would only find Gutierrez guilty if the prosecution proved each of the elements of the offense beyond a reasonable doubt. The trial judge then extensively discussed the difference between robbery and burglary with Perez, and explained that a robbery only occurs when the defendant "threaten[s]" or "assault[s]" the victim in some way. After clarifying the distinction between the two crimes, the judge asked Perez, "[I]f they don't prove robbery, they prove something else like a burglary, you know, what would your verdict be after you hear that kind of case?" Perez responded, "I guess it would be not guilty." Perez then stated to defense counsel, "I guess

that the way the Judge explained it, they need to prove all six in order to find the man guilty, I think I can go with that . . . I understand it now the way the Judge explained it, yes, sir."

Our decision in *Miniel v. Cockrell*[23] disposes of Gutierrez's challenge. In that case, the petitioner-appellant challenged a juror who initially expressed difficulty understanding the difference between the terms "intentional" and "deliberate."[24] We nonetheless denied a COA because the juror's responses ultimately "indicated that he perceived some difference between the two terms and that he would base his answers on the evidence presented."[25] Here, too, Perez ultimately "indicated that he perceived some difference between" robbery and burglary "and that he would base his answers on the evidence presented."[26] As a result, no reasonable jurist would debate whether Perez ultimately displayed views that would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[27]

Where "there is lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion" to determine whether to excuse a particular venireperson.[28] Because the state trial judge personally observed and participated in the voir dire process, we defer to the state trial judge's assessment of Perez's ability and willingness to fairly and impartially apply the correct legal standards.[29]

---

[23] 339 F.3d 331.
[24] *Id.* at 340-41.
[25] *Id.* at 341.
[26] *See id.*
[27] *See Wainwright*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45).
[28] *Uttecht v. Brown*, 551 U.S. 1, 20 (2007).
[29] *See Wainwright*, 469 U.S. at 425-26.

No. 13-70036

For the foregoing reasons, we deny a COA on Gutierrez's juror impartiality claim.

D.

Gutierrez next claims "that he ha[s] been deprived of his right to a fair and impartial jury" because "one or more of his jurors had looked at media coverage of the trial during trial." He also claims that the jury improperly "considered the possibility of parole in rendering its verdict."

The state trial court held an evidentiary hearing on this issue before ruling on Gutierrez's motion for a new trial. Gutierrez intended to call three jurors as witnesses at this hearing: Simon Betancourt ("Betancourt"), Beatriz De La Garza ("De La Garza"), and Melinda Hockaday ("Hockaday"). However, Gutierrez was ultimately unable to locate either De La Garza or Hockaday. The state trial court therefore quashed the subpoenas as to De La Garza and Hockaday and heard testimony only from Betancourt. The record does not reflect that Gutierrez was able to locate De La Garza or Hockaday at any time after the hearing.

Betancourt testified that the jurors mentioned parole only briefly during sentencing deliberations. The jurors ceased discussing parole immediately after the foreperson reminded them not to consider it. Betancourt further testified that he had not seen any media coverage of the case while serving on the jury.

On the basis of Betancourt's testimony, the state trial court orally denied Gutierrez's motion for a new trial. Immediately after the state trial court denied the motion, Gutierrez offered his investigator's activity reports into the record. The activity reports purported to set forth the testimony that Hockaday and De La Garza would have given had they appeared at the hearing.

15

The activity reports give no reason to believe that, if Hockaday and De La Garza had in fact testified, their testimony would have been materially inconsistent with Betancourt's testimony. According to the activity report, Hockaday stated that the jurors did not discuss parole after the foreperson reminded them not to do so. De La Garza stated that the jury discussed and considered parole, "but not for very long" and "not that much," which is consistent with Betancourt's testimony. Thus, no reasonable jurist would debate whether discussions of parole had any influence on the jury verdict.

Nor do their statements give any indication that exposure to media coverage improperly influenced the verdict. Hockaday's activity report unequivocally states: "Everybody avoided media coverage. Nobody said anything about the trial. I knew that I was not supposed to be involved with any media coverage so I avoided it." De La Garza stated that she viewed some media coverage, but that it merely reiterated the evidence that was presented at trial. De La Garza did not suggest that this media coverage was prejudicial, or that it influenced the jury's verdict in any way. Thus, even after considering their statements in addition to Betancourt's testimony, there is no suggestion that any of the jurors were exposed to media coverage that was innately prejudicial.

Thus, no reasonable jurist would debate whether juror misconduct tainted Gutierrez's trial or sentencing. Nor would reasonable jurists debate whether the district court should have held an evidentiary hearing before ruling on Gutierrez's jury misconduct claim. We therefore deny Gutierrez a COA on this issue.

## E.

Gutierrez argues next that the prosecution impermissibly questioned a defense witness about his religious beliefs in violation of the First Amendment.

During the punishment phase of Gutierrez's trial, Gutierrez called Dr. Jonathan Sorenson ("Sorenson"), a professor of criminal justice at the University of Texas-Pan American who conducts actuarial analyses of crime and recidivism, to testify as to Gutierrez's future dangerousness. On cross-examination, the prosecution sought to discredit Sorenson by showing that he "works in a college in an ivory tower situation; and we work in the real world." To that end, the prosecution engaged in the following exchange with Sorenson:

| | |
|---|---|
| Prosecution: | Do you believe in good and evil? |
| Sorenson: | I'm not a philosopher. |
| Defense Counsel: | I object as to relevance, Your Honor. |
| The Court: | It's overruled. |
| Sorenson: | I'm sorry. I wouldn't know how to define those terms. |
| Prosecution: | Do you believe in God? |
| Defense Counsel: | Objection, Your Honor, as to relevance. |
| The Court: | I'll sustain that objection. |
| Prosecution: | Do you believe that evil is out there and that we have to fight evidence [sic]? |
| Defense Counsel: | I'm going to object, Your Honor, as to relevance. |
| The Court: | It's overruled. |
| Prosecution: | Answer that. |
| Sorenson: | That there's evil out there? |
| Prosecution: | Yeah, a force called evil. |
| Sorenson: | No, I don't believe that. |

Then, during closing arguments, the prosecution discussed religious beliefs as a preface to addressing Sorenson's testimony:

This is not about whether the death penalty is right or wrong. We went through that. We talked to all of you when you sat right there. We went through that, and we went through all the religious reasons and whatnot. We know that you're going to have a problem. We know.

But you have to tell the truth. You have to be true to yourselves above all things. Religion says that too. Religion says that there's man's laws and God's laws; and you've got to follow the man's laws

and you've got to pay the man's penalties so that you can live in society here. That's in the bible. It is. And you know that.

And when Christ was on the cross and the man next to him, the thief, he forgave him [sic]. But did he throw him off the cross and let him live? They let him go ahead and die to pay for what he did. You've got to pay on it. There's got to be accounting here. This is the real world. This is not an ivory tower. It's not a perfect place . . . .

I asked the doctor [Sorenson] if he believed in justice, not the kind of justice for fair play, but justice where you get what you deserve. He ultimately said he does. The defense objected, "I object. That's not relevant. Justice is not relevant."

Folks, that's what this is all about. Our society is going to go if we don't have accounting for these terrible kinds of things . . . .

The good doctor [Sorenson] says there's – he doesn't believe in the evil force in the world. He couldn't answer. He believes in God.

There's evil in the world. There's evil in the world. I know it because I've dedicated my life to fighting it.

For the following reasons, reasonable jurists would not debate whether the prosecutor's questioning and argument violated the First Amendment. First, the trial court sustained defense counsel's objection to the prosecutor's only direct question regarding Sorenson's belief in God. Second, to the extent the balance of the prosecution's questions and argument could be viewed as touching on the witness's religious views, Gutierrez has not identified any clearly established First Amendment precedent that barred the prosecutor from asking Sorenson questions that peripherally touched on his religious beliefs or commenting upon those beliefs during closing argument. Gutierrez insists that the Supreme Court held to the contrary in *Dawson v. Delaware*,

18

but that case only concerned evidence of the *defendant's own* beliefs.[30] The Supreme Court did not hold that a defendant may obtain relief from a conviction when the prosecution questions a *defense witness* about his or her religious beliefs. Gutierrez also cites *Quinn v. United States*, 349 U.S. 155 (1955), *Emspak v. United States*, 349 U.S. 190 (1955), and *Bart v. United States*, 349 U.S. 219 (1955) for the proposition that "the Supreme Court [has] repeatedly held that the Government may not probe the minds of witnesses on religious beliefs," but those cases are also inapposite. *Quinn*, *Emspak*, and *Bart* all discuss the consequences of a defendant's own refusal to answer a congressional committee's questions regarding the defendant's affiliation with the Communist party. None of these cases has anything to do with questioning a witness about his or her religious beliefs during a criminal trial. Thus, no reasonable jurist would debate whether the state court misapplied clearly established Supreme Court First Amendment jurisprudence.

The district court also analyzed whether the prosecutor's comments were improper under traditional due process standards, and concluded they were not. We agree.

> In habeas corpus proceedings, we review allegedly improper prosecutorial statements under a strict standard. "The statements must render the trial fundamentally unfair." "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."[31]

Reasonable jurists would not disagree regarding whether the prosecutor's religious references violated Gutierrez's due process rights. The prosecutor did

---

[30] 503 U.S. 159, 160, 168 (1992).

[31] *Dowthitt v. Johnson*, 230 F.3d 733, 755 (5th Cir. 2000) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000)).

not exhort the jury to apply the Biblical law of capital punishment in place of the State's law; to the contrary, the prosecutor acknowledged that the jury should judge Gutierrez on the basis of "man's laws." In any event, the prejudicial effect of the prosecutor's comments was minimal, and certainly did not approach a denial of due process.

## F.

Gutierrez argues next that the Government violated *Brady v. Maryland*[32] by failing to turn certain DNA evidence over in sufficient time to make proper use of it at trial. Gutierrez concedes that the Government did indeed provide him the evidence in question prior to trial, but he contends that the Government did not make this evidence available soon enough to allow Gutierrez to conduct DNA testing and assess the results.

The district court correctly ruled that Gutierrez procedurally defaulted on his *Brady* claim.[33] "A federal habeas claim is procedurally defaulted when the state court has based its rejection of the claim on a state procedural rule that provides an adequate basis for relief, independent of the merits of the claim."[34] "Federal habeas review of procedurally defaulted claims is barred 'unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that

---

[32] 373 U.S. 83 (1963). *Brady* holds "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

[33] Gutierrez contends that "[t]he District Court did not rely upon the procedural bar" to resolve his *Brady* claim. Gutierrez is incorrect. Although the district court considered the substantive merits of Gutierrez's *Brady* claim in the alternative, the court did indeed reject this claim on procedural grounds.

[34] *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (citing *Coleman v. Thompson*, 501 U.S. 722, 729-32 (1991)).

No. 13-70036

failure to consider the claims will result in a fundamental miscarriage of justice.'"[35]

Texas's abuse of the writ doctrine, which is codified in Texas Code of Criminal Procedure Article 11.071 § 5(a), bars the state court from considering a successive habeas petition unless the petitioner meets certain prerequisites. A dismissal pursuant to Article 11.071 "is an independent and adequate state ground for the purpose of imposing a procedural bar" in a subsequent federal habeas proceeding.[36]

Gutierrez raised his *Brady* claim for the first time in a successive state habeas petition. The Texas Court of Criminal Appeals "dismissed the [successive] application as an abuse of the writ without considering the merits of [his] claims" because he had "failed to satisfy the requirements of Article 11.071, § 5(a)." Thus, adequate and independent state law bars Gutierrez's *Brady* claim unless he can demonstrate cause and prejudice for not raising the claim in his initial state habeas petition, or that this Court's refusal to consider the claim would amount to a fundamental miscarriage of justice.[37] Gutierrez offers no persuasive reason why either of these exceptions to the procedural bar would apply. Reasonable jurists would therefore not debate the district court's ruling.

## IV.

Because all of Gutierrez's arguments lack merit, Gutierrez's request for a COA is hereby DENIED.

---

[35] *Id.* (citing *Coleman*, 501 U.S. at 750).
[36] *Id.* at 342 (citations omitted)
[37] *See id.* at 341 (citing *Coleman*, 501 U.S. at 750).

21